# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF FLORIDA
### TALLAHASSEE DIVISION

LEAGUE OF WOMEN VOTERS
OF FLORIDA, ET AL.,

    *Plaintiffs*,

v.                      Case No. 4:18cv525-MW/CAS

RICHARD L. SCOTT, in his official
capacity as Governor of the State
of Florida,

    *Defendant*.

_____/

## ORDER DENYING PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

This is a case about the precariousness of public trust. Defendant Rick Scott is Florida's current governor and a candidate for the United States Senate. ECF No. 1, at ¶ 10. On November 6, 2018, Florida voters delivered a narrow margin in which Scott led his opponent, Senator Bill Nelson, by less than one-quarter of one percent. At the time of this Order, Scott's lead was less than 13,000 out of more than 8.1 million votes cast, or approximately 0.15 percent.[1] Under Florida law, a manual recount is required for election results with margins less than one-quarter of one percent. Fla. Stat. § 102.166(1).

---

[1] *Available at* https://floridaelectionwatch.gov/FederalOffices/USSenator.

1

It is under these circumstances that this Court has considered, after an evidentiary hearing on November 15, 2018, Plaintiffs' Emergency Motion for Preliminary Injunction. ECF No. 4. This Court previously denied Plaintiffs' motion inasmuch as it was for a temporary restraining order. Now, after giving Scott an opportunity to be heard, this Court **DENIES** Plaintiffs' motion.

I

Florida's Governor has a variety of powers that directly and indirectly relate to the electoral process. Scott possesses the authority to suspend public officers, including county-level canvassing board members and supervisors of elections. Fla. Const. art. IV § 7(a). He sits as a member of the state's Elections Canvassing Commission and he has appointed the two other members of the commission, which certifies the result of Florida's elections.[2] Fla. Stat. § 102.111. Moreover, the Florida Department of Law Enforcement ("FDLE") acts "[u]pon specific direction [of] the Governor." Fla. Stat. § 943.03(2). "[T]he department shall investigate the misconduct, in connection with their official duties, of public officials and employees . . . subject to suspension or removal by the Governor." *Id*.

---

[2] At a scheduling conference hearing, Scott's general counsel articulated Scott's intent to recuse himself from the Elections Canvassing Commission. Later, on his campaign's Twitter account, Scott confirmed this recusal. *Available at*
https://twitter.com/ScottforFlorida/status/1062747538602844161.

On November 8, just two days after the election and while votes were still being tabulated, Scott held a press conference outside of the Governor's Mansion. Against the symbolic backdrop of the executive residence, Scott apparently appeared in his capacity as a candidate for U.S. Senate. *See, e.g.*, Pl.'s Ex. 1-4 (stating "I am proud to be the next senator"). During the press conference, Scott "ask[ed]" state law enforcement to investigate two counties, Broward County and Palm Beach County. *Id.* He asserted "rampant fraud" existed in the counties, despite the presence of election monitors from the Florida Department of State who had not reported any criminal activity. *Id.*; ECF No. 1, at ¶ 34. Scott also said, "I will not sit idly by while unethical liberals try to steal this election from the great people of Florida." Pl.'s Ex. 1-4. Later, Scott appeared on national television where he declared that he was "gonna fight this and we're gonna win." Pl.'s Ex. 1-5. He also vowed that he was "gonna do everything we can" to "win this" including "looking at every legal remedy we can exercise." *Id.*

On November 10, Scott "urg[ed] every Sheriff in the State of Florida to watch for any violations during the recount process as outlined in Florida law" from his campaign Twitter account. Pl.'s Ex. 1-1. In an accompanying press release, Scott also "urg[ed]" sheriffs to "watch for any violations and take appropriate action." Pl.'s Ex. 1-2.

## II

To begin, this Court addresses two threshold issues. First, Plaintiffs have standing. Representatives of the two organizational plaintiffs, Common Cause Florida and the League of Women Voters of Florida, persuasively testified at the evidentiary hearing that the resources of their respective organizations have been diverted. They also asserted as much in affidavits. ECF No. 1-1, at ¶ 8; ECF No. 1-2, at ¶ 7. Drain on resources has long been grounds for organizational standing. *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379 (1982). Because the organizational plaintiffs have standing, this Court need not address the other plaintiffs because if there are more than one plaintiffs "[a]t least one plaintiff must have standing to seek each form of relief requested in the complaint." *Town of Chester, N.Y. v. Laroe Estates, Inc.*, 137 S. Ct. 1645, 1651 (2017).

Ripeness is a steeper hill for Plaintiffs to climb. "A claim is not ripe for adjudication if it rests upon 'contingent future events that may not occur as anticipated, or indeed may not occur at all.'" *Texas v. United States*, 523 U.S. 296, 300 (1998) (quoting *Thomas v. Union Carbide Agric. Prods. Co.*, 473 U.S. 568, 580–81 (1985)). "There must be a substantial likelihood that the plaintiff will suffer future injury: a 'perhaps' or 'maybe' chance is not enough." *Malowney v. Fed. Collection Deposit Grp.*, 193 F.3d 1342, 1347 (11th Cir. 1999).

It is not immediately clear if Plaintiffs have or have not established imminent harm to create a live controversy. But, assuming arguendo that the controversy is ripe, Plaintiffs have not established a substantial likelihood of success on the merits.

## III

Plaintiffs can only prevail on their motion for preliminary injunction if they show that (1) they have a substantial likelihood of success on the merits; (2) irreparable injury will be suffered unless the injunction issues; (3) the threatened injury to Plaintiffs outweighs whatever damage the proposed injunction may cause Scott; and (4) if issued, the injunction would not be adverse to the public interest. *See Siegel v. Lepore*, 234 F.3d 1163, 1176 (11th Cir. 2000) (citing *McDonald's Corp. v. Robertson*, 147 F.3d 1301, 1306 (11th Cir. 1998)). Although a "preliminary injunction is an extraordinary and drastic remedy," it nonetheless should be granted if "the movant 'clearly carries the burden of persuasion' as to the four prerequisites." *United States v. Jefferson Cty.*, 720 F.2d 1511, 1519 (11th Cir. 1983) (quoting *Canal Auth. v. Callaway*, 489 F.2d 567, 573 (5th Cir. 1974)).[3] A preliminary injunction "should not be granted unless the movant *clearly* carries its burden of persuasion on *each* of these prerequisites." *Suntrust Bank v. Houghton Mifflin Co.*, 252 F.3d 1165,

---

[3] In *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc), the Eleventh Circuit adopted as binding precedent all decisions of the former Fifth Circuit handed down prior to October 1, 1981.

1166 (11th Cir. 2001) (emphases added). Thus, if a party fails on one prong of the preliminary injunction standard, this Court need not consider the other three. *See Pittman v. Cole*, 267 F.3d 1269, 1292 (11th Cir. 2001) ("We have held on occasion that when a plaintiff fails to establish a substantial likelihood of success on the merits, a court does not need to even consider the remaining three prerequisites of a preliminary injunction.").

## IV

The crux of this case is whether Scott's post-Election Day words and actions require extraordinary court-ordered recusal under the U.S. Constitution because of alleged due process deprivations.[4] This Court recognizes the demarcation between typical campaign-trail puffery and the words and actions of a public official acting in an official capacity. While campaign-trail rhetoric is increasingly bombastic, imprudent, and not necessarily rooted in objective facts, there is a critical line between campaign rhetoric and that rhetoric transforming into state action that requires judicially imposed recusal.

When a public official acting in his official capacity crosses that line, he ventures into a thicket of actual or potential bias. Then, constitutional alarm

---

[4] Plaintiffs also bring forth theories under the First Amendment's right to free association, ECF No. 1, at 17–18, and the fundamental right to vote, *id.* at 18. Neither argument is persuasive. Plaintiffs offer no evidence indicating that they will be discouraged or prevented from freely associating with any groups. Plaintiffs also offer no evidence that Scott's post-election conduct will impose a severe burden on the right to an effective vote.

6

bells ring. Constitutionally required recusals are rare and arise in "extraordinary situation[s]." *Caperton v. A.T. Massey Coal Co., Inc.*, 556 U.S. 868, 887 (2009).

Here, Scott has toed the line between imprudent campaign-trail rhetoric and problematic state action. But he has not crossed the line.

As a candidate, Scott can—and has—filed lawsuits. As a candidate, he can appear on television, post on social media, and even make baseless remarks about counties where populations cast majorities of ballots for his opponent. *E.g.* ECF No. 1, at ¶ 24 (claiming "rampant fraud" exists in Broward and Palm Beach Counties). Scott can also make speeches outside the Governor's Mansion as a candidate.

What Scott cannot do is undercut the count and mandatory recount of votes from his perch of public official. Grave problems arise when an individual involved in the electoral process uses his official powers to influence the outcome. Unconstitutionality can follow. Binding precedent could not be clearer. "The due process clause of the fourteenth amendment prohibits action by state officials which seriously undermine the fundamental fairness of the electoral process." *Duncan v. Poythress*, 657 F.2d 691, 700 (5th Cir. Unit B. Sept. 1981). "If the election process itself reaches the point of patent and fundamental unfairness, a violation of the due process clause may be indicated and relief under § 1983 there [is] in order." *Id*. at 703 (quoting *Griffin v. Burns*,

7

570 F.2d 1065, 1077 (1st Cir. 1978)). Such situations arise when "the very integrity of the electoral process" is at risk. *Id.*[5]

Due process protections extend beyond official action. Due process concerns arise when an official creates "a serious, objective risk of actual bias." *Caperton*, 556 U.S. at 886. In *Caperton*, the Supreme Court cautioned that "fears of bias can arise when . . . a man chooses the judge in his own cause" in a manner similar to longstanding principles that "no man is allowed to be a judge in his own cause." *Id.*; *see also In re Murchison*, 349 U.S. 133, 136 (1955) ("[N]o man can be a judge in his own case and no man is permitted to try cases where he has an interest in the outcome."). Accordingly, "the Due Process Clause has been implemented by objective standards that do not require proof of actual bias." *Caperton*, 556 U.S. at 883 (citing *Tumey v. Ohio*, 273 U.S. 510, 532 (1927), *Mayberry v. Pennsylvania*, 400 U.S. 455, 465–66 (1971), *and Aetna Life Ins. Co. v. Lavoie*, 475 U.S. 813, 825 (2009)). The focus is "whether, 'under a realistic appraisal of psychological tendencies and human weakness,'" the official's "interest 'poses such a risk of actual bias or prejudgment that the practice must be forbidden if the guarantee of due process is to be adequately

---

[5] This Court notes that "electoral process" does *not*, as some public officials have caterwauled, mean *only* Election Day. The electoral process is comprehensive, encompassing early voting, Election Day, the days and weeks after Election Day during which votes are counted, and, if necessary, recounts as various laws so require.

8

implemented.'" *Id.* at 883–84 (quoting *Withrow v. Larkin*, 421 U.S. 35, 47 (1975)).[6]

*Caperton* was an "extreme" case. *Id.* at 887. There, the chairman of a company contributed $3 million to a West Virginia Supreme Court of Appeals candidate after a jury penalized the chairman $50 million in a civil lawsuit but before the chairman appealed the verdict. *Id.* at 872–73. The candidate won, declined to recuse himself from the appeals multiple times, and twice reversed the verdict against the chairman. *Id.* at 873–76. The Supreme Court concluded that the close proximity and interests between the chairman and state court justice presented an objective risk of bias and required recusal under the Due Process Clause. *Id.* at 886.

Another extreme case was that of former Tennessee Governor Gordon Browning. In the 1938 Democratic primary, Browning was alleged to unleash "a campaign of terror in Shelby County," including his "inten[tion] to use State troops to carry out his boast of stopping the voting by local voters in Shelby County and to terrorize them." *Joyner v. Browning*, 30 F. Supp. 512, 514 (W.D.

---

[6] This Court recognizes that the overwhelming majority of recusals required under the Due Process Clause are judicial recusals. That so few constitutional violations are alleged against other types of public officials could be attributed to the prudence and foresight that many public officials show in recusing themselves from technically overseeing the mechanics of their own vote tabulations. Regardless of the novelty of this issue, the simple fact that constitutionally required recusals have largely been judicial does not limit *Caperton* from applying to non-judicial constitutionally required recusals. Scott's counsel agreed that recusals extend to non-judicial officials during the evidentiary hearing.

9

Tenn. 1939). With neither request for them nor need for them, Browning ordered the local militia into Shelby County after "seeking to create disorder" and "attempting to create a disturbance to justify himself in sending troops into the County." *Id*. The district court emphasized it had the "right and duty to enjoin" the ostensibly self-proclaimed "dictatorial and tyrannical Governor of Tennessee" because "[t]he threatened use of troops and the threat of military dictatorship by the former Governor deprived citizens of the right to vote." *Id*. at 519. The court then enjoined Browning from his "unlawful and unconstitutional and threatened acts." *Id*.

Compare these examples to Scott's post-Election Day conduct. Though sometimes careening perilously close to a due process violation, Scott's most questionable conduct has occurred in his capacity as a candidate rather than as governor. For example, it was through his campaign that Scott "urg[ed]" local law enforcement to be on the lookout for potential fraud. Pl.'s Ex. 1-1 & 1-2. As votes were still being counted, Scott *asked*—but did not *order*—state law enforcement to investigate two counties, citing no evidence for the investigation. Although the Department of State already had monitors in Broward County, and they had made nary a whisper about any criminal activity, ECF No. 1, at ¶ 28, Scott merely requested law enforcement investigate possible untoward conduct. If Scott *ordered* the FDLE to investigate, then a stronger case could be made for unconstitutional

intimidation—a witch hunt, to use the parlance of the era. Arguably, Scott was acting as governor when asking state law enforcement to launch an investigation. But there is a crucial and important distinction between asking and ordering.

Even so, Scott's request to state law enforcement must be viewed in the context of Scott's other contemporaneous public statements. "I will not sit idly by," Scott said outside the Governor's mansion, "while unethical liberals try to steal this election." Pl.'s Ex. 1-4. Later on television, after noting his order to state law enforcement, Scott declared "we're gonna fight this and we're gonna win." Pl.'s Ex. 1-5. He also explained "we're gonna do everything we can," "we're gonna fight this and we're gonna win this." *Id*. These are Scott's most troubling utterances. But this Court finds that they are campaign-trail bombast rather than official gubernatorial statements. They are a candidate's desire—rather than a governor's proclamations under the auspices of his public office—to "fight" and "win."

What is more, Scott has not yet moved to indicate an objective risk of bias. He has not suspended any election official. He has not ordered any investigation. He has not interfered with the recount so far. He has even recused himself from the Elections Canvassing Commission.[7] All Plaintiffs

---

[7] This list of actions and inactions is not meant to be comprehensive. Scott could have taken—or still could take—steps to cross the line from campaign-trail bombast to due process deprivations.

have are statements of a candidate exceedingly close to a United States Senate seat. Imprudent they may be—unconstitutional they are not.

"No man is allowed to be a judge in his own cause, because his interest would certainly bias his judgment, and, not improbably, corrupt his integrity." *The Federalist* No. 10 (James Madison). Scott should be on notice. Florida is entering its first-ever manual recount in which Scott is an interested party with ample power to meddle in the process. Scott's past statements occurred primarily when he wore his candidate hat. The Due Process Clause requires Scott to remain impartial in his gubernatorial capacity.[8]

## V

The Constitution requires recusal from public officials when there is a serious, objective risk of bias. *Caperton*, 556 U.S. at 886. The candidate's statements offered here, though haphazard and reckless, do not rise to that level. Accordingly,

---

[8] "No officer or employee or the state . . . shall use his or her official authority or influence for the purpose of interfering with an election . . . or coercing or influencing another person's vote or affecting the result thereof." Fla. Stat. § 104.31(1)(a).

**IT IS ORDERED:**

Plaintiffs' motion for preliminary injunction, ECF No. 4, is **DENIED**. However, this case is not closed and future actions could demand further consideration.

**SO ORDERED on November 15, 2018.**

                                        <u>**s/Mark E. Walker**</u>
                                        **Chief United States District Judge**